[No. 64958-8. En Banc.]
Argued October 14, 1997. Decided February 5, 1998.
CEDAR COUNTY COMMITTEE, ET AL., *Petitioners*, v. RALPH
MUNRO, *Respondent*.

*Rhys A. Sterling*, for petitioners.

*Christine O. Gregoire, Attorney General*, and *Jeffrey T. Even, Assistant*, for respondent.

DOLLIVER, J. — Petitioners in this case include the Cedar County Committee and seven individuals (collectively, the Committee), all of whom have participated in a petition drive seeking to create a new county. They commenced this case as an original action in the Washington Supreme

Court, seeking a writ of mandamus directed to Secretary of State Ralph Munro (the Secretary).

The Committee submitted petitions, pursuant to article XI, section 3, of the Washington Constitution, to the State Legislature to create a new county within Washington state. The petitions advocate the creation of Cedar County in existing King County.

Between February 28 and November 4, 1996, Petitioner Lois Gustafson submitted to the Legislature signed petition sheets proposing the creation of Cedar County. The Chief Clerk of the House and the Secretary of the Senate transmitted the petitions to the Secretary of State with the request that he examine the signatures on each of the petitions and report the results of those examinations to the Legislature. Although there are no implementing statutes governing the petition process for the formation of new counties referred to in the state constitution or providing for the verification of the signatures on the formation petitions for new counties (by either state or local election officials), the Secretary agreed, with the assistance of local election officials in the areas where the new counties were proposed, to compare the signatures on the formation petitions to the voter registration records of those counties.

The Secretary arranged for the Division of Records and Elections in King County to compare the signatures on the Cedar County petitions to the voter registration records of King County and report the results. The Division of Records and Elections determined that there were 97,226 registered voters in the area of the proposed county at the time the petitions were submitted. Of those voters, a total of 23,765 signed the petitions submitted by the Committee.

The proponents of the new county claim a petition for a new county is sufficient if the number of valid signatures of registered voters who reside in the proposed county exceeds 50 percent of the number of votes cast in that territory at the last state general election, as opposed to 50 percent of the registered voters residing in the area of the

proposed county. The Secretary therefore informed the Legislature that, at the previous general election, 45,033 votes were cast within the proposed Cedar County boundaries.

The Secretary, together with the Chief Clerk of the House, the Secretary of the Senate, and representatives of the presiding officers of the House and Senate, reached a consensus that the Secretary has no legal authority to determine the sufficiency of formation petitions for new counties. His actions in comparing the signatures on the petitions to voter registration records were designed to provide information in order that the Legislature might make a determination about the sufficiency of those petitions.

The Legislature did not act on either the report or the petitions, and the Committee petitioned this court for a writ of mandamus directed to the Secretary. Specifically, the Committee seeks a writ compelling the Secretary to perform his "duty" and certify its petitions as an "election." Its argument is this: Having satisfied the state constitutional prerequisites to new county formation, the Committee is entitled to have the Secretary certify its petitions—the "duty" this court should compel the Secretary to perform—which in turn will require the Legislature to create Cedar County.

We disagree. The Secretary of State has no duty to certify the Committee's petitions as an election. Moreover, the creation of a new county is an exercise of legislative power subject only to state constitutional limitations; the Legislature cannot be compelled to form a new county. Finally, the Committee has not submitted the signatures of a majority of the voters living in proposed Cedar County.

■ Because the Committee seeks a writ of mandamus directed to the Secretary, we turn first to the question of the Secretary's duty. A writ of mandamus is appropriate only where a state officer has a duty to act. *State ex rel. Burlington N., Inc. v. Washington Utils. & Transp. Comm'n*, 93 Wn.2d 398, 410, 609 P.2d 1375 (1980). The duty to act

must be imposed expressly by law, and involve no discretion. *State ex rel. Clark v. City of Seattle*, 137 Wash. 455, 461, 242 P. 966, 46 A.L.R. 253 (1926). The Committee must therefore show the Secretary is compelled by law to perform a specific act. *Walker v. Munro*, 124 Wn.2d 402, 407, 879 P.2d 920 (1994). The Committee argues the Secretary has a duty to certify its petitions because they are an election, but cites no authority for this proposition.

The formation of new counties in this state is governed by article XI, section 3, of the Washington State Constitution, which provides:

> No new counties shall be established which shall reduce any county to a population less than four thousand (4,000), nor shall a new county be formed containing a less population than two thousand (2,000). There shall be no territory stricken from any county unless a majority of the voters living in such territory shall petition therefor and then only under such other conditions as may be prescribed by a general law applicable to the whole state. . . .

■ The Secretary has never treated petitions for new counties as "special elections" or had *any* role, much less a duty, in forming new counties since adoption of the state constitution. Here, the petitions were submitted to the Legislature, not the Secretary, and, as an accommodation to the Legislature, the Secretary reported his findings. The Legislature appears to have expected only to receive a report, not the certification of the petitions as an election.

■■ The Committee argues the petition process was identical to an election. However, the petition process shares none of the key attributes of an election, such as a secret ballot, the ability to vote for or against an issue rather than simply sign onto a single statement of opinion, or the "snapshot" nature of the electorate's expression of its views on election day, as opposed to the ongoing (in this case, four years long) collection of signatures on a petition.

Aside from the fact that a petition drive differs in significant ways from an election, no statute or Washington

Administrative Code provision addresses special elections by petition or any role for the Secretary in connection with such petitions. Here, the Secretary merely provided factual information to the Legislature regarding the number of signatures on the Committee's petitions. The Secretary provided that service through an agreement with the Legislature. He was not, and is not, duty bound to perform any function in the proposed formation of a new county.

While not compelled by our holding to do so, we nevertheless take this opportunity to address the Committee's remaining claims and to affirm the continuing vitality of this court's early holdings regarding the Legislature's discretion in the context of county formation.

In its petition for writ of mandamus, the Committee asks that this court compel the Secretary to "fulfill his duty" and certify the petition results as being constitutionally sufficient, and then to transmit his certification to the Legislature. The Committee's basic legal premise throughout this case has been that such a certification will constitutionally obligate the Legislature to enact whatever laws may be necessary to establish the new county and enable it to function.

The Committee's premise is flawed for two reasons. Initially, we are not persuaded the petitions are constitutionally sufficient. Again, CONST. art. XI, § 3, entitled "**NEW COUNTIES**," provides:

> No new counties shall be established which shall reduce any county to a population less than four thousand (4,000), nor shall a new county be formed containing a less population than two thousand (2,000). There shall be no territory stricken from any county unless a majority of the voters living in such territory shall petition therefor and then only under such other conditions as may be prescribed by a general law applicable to the whole state. . . .

██ ██ Proposed Cedar County (and what would remain of King County) plainly meets the population criteria of the first sentence. Only the prerequisite of the second

sentence is at issue. The area comprising the proposed Cedar County was home to 97,226 registered voters at the time the petitions were examined. Those petitions contained the signatures of 23,765 registered voters, less than one-fourth of the total. Assuming the petition requirement applies to new county formation, rather than only to annexation by an existing county of another county's territory, the petitions fall short of the requisite number of signatures.

The Committee contends the signatures meet the constitutional requirement if they number at least 50 percent, plus one, of the number of votes cast in the preceding general election. If the Committee were correct, then the petition signatures would suffice: 45,033 votes were cast in the proposed Cedar County boundaries at the general election preceding submission of the petitions, which contained over half that many signatures. However, the plain language of the constitution specifies that the petition must bear the signatures of a majority of the voters living in the territory, rather than merely a majority of the number who exercised their franchise at the most recent opportunity.

The Committee argues it is the framers' use of the term "voters" rather than "electors" living within the subject territory which constitutes the basis for sufficiency. For the importance of this distinction, the committee relies on an inapposite Florida case in which it was held:

> [A voter] is an elector who does vote, and in the present instance a voter is one who voted at the last November general election, and on the question in controversy is one who actually voted, either for or against the creation of the new county . . . . An elector is not a voter unless he votes, yet he still retains his qualifications as an elector."

*State ex rel. Thomas v. Williams*, 100 Fla. 996, 1003, 130 So. 428, 430 (1930) (quoting *State ex rel. McCue v. Blaisdell*, 18 N.D. 31, 36, 119 N.W. 360 (1909)).

The Committee's reliance on the foregoing language is

misplaced. The Florida court, in deciding a different question, was quoting directly from an opinion of the North Dakota Supreme Court in *State ex rel. McCue v. Blaisdell*, 18 N.D. 31, 119 N.W. 360 (1909) as authority for the definitions of "voter" and "elector." In the North Dakota case, the constitution provided that changes in the boundaries of counties should not be effective until submitted to the electors of the county affected and approved by a majority of all the legal votes cast at a general election. The change proposed was submitted to the electors of the proposed county at a general election and approved by a slight majority of the votes cast on that proposition, but the approving votes were not more than half the total votes cast for the various candidates for public office. The court held that the change was approved because the question of the alteration of county boundaries was separate and distinct from the selection of officials. *Blaisdell*, 18 N.D. at 38-39. The North Dakota court distinguished "voter" from "elector" in order to determine the meaning of the phrase, "a majority of all the legal votes cast at a general election." *Blaisdell*, 18 N.D. at 36-37.

When the North Dakota court defined "voter" as one who voted in the last general November election, it was not referring, as is the Committee, to an unrelated general election which preceded the county formation question; it was referring to those who voted for or against the very creation of the new county. The Committee's reliance on these out-of-state cases is misplaced.

■ One explanation of the framers' choice of the term "voters" rather than "electors" is that they wanted to distinguish registered voters, in those counties that had a voter registration system, from those who were qualified, but not registered, to vote. A "voter" is one who has become eligible to vote by reason of registration, while an "elector" is merely one who is qualified, by reasons, e.g., of age and citizenship, to vote. *Defilipis v. Russell*, 52 Wn.2d 745, 746-47, 328 P.2d 904 (1958).

The framers did, in fact, address the issue of voter

registration in article VI, section 7, of the state constitution:

> The legislature shall enact a registration law, and shall require a compliance with such law before any elector shall be allowed to vote; *Provided*, that this provision is not compulsory upon the legislature except as to cities and towns having a population of over five hundred inhabitants. In all other cases the legislature may or may not require registration as a prerequisite to the right to vote, and the same system of registration need not be adopted for both classes.

The phrase "legal voters" has been held to mean "registered voters" in those precincts where there was voter registration. *State ex rel. Mullen v. Howell*, 108 Wash. 340, 343, 184 P. 333 (1919). We also note the Committee's theory would allow a minority of those eligible to dictate to the vast majority who, in this case, did not sign a petition to form Cedar County. Voter turnout fluctuates and can be particularly low in odd-year elections. It would be absurd in these days of statewide voter registration to bind the question of county formation to the votes cast for or against a candidate or issue on the ballot in a previous, unrelated election.

■■ Even presentation of a sufficiently signed petition would not impose upon the Legislature a duty to create the new county. The Committee's argument is based on the assumption that article XI, section 3, is a retention of power to the electorate and not a limitation on government. However, the provision does not state that a county shall be created if certain conditions are met; it mandates that no new counties can be created unless the conditions are met. The plain language of the constitution prohibits the Legislature from exercising its discretion to create a new county unless specified requirements are fulfilled. It does not mention a ministerial duty to create a county nor provide a right by citizens to form a county. As evidence of this, THE JOURNAL OF THE CONSTITUTIONAL CONVENTION points out that the provision "was not a grant of power, but merely a restriction on the Legislature." THE JOURNAL OF

THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889 at 710 (Beverly Paulik Rosenow ed., 1962). As this court has explained, "the state constitution is a limitation upon the power of the legislature rather than a grant thereof. Insofar as legislative power is not limited by the constitution it is unrestrained." *Moses Lake Sch. Dist. No. 161 v. Big Bend Community College*, 81 Wn.2d 551, 555, 503 P.2d 86 (1972), *appeal dismissed*, 412 U.S. 934 (1973).

 Whether the Legislature can be subject to a "ministerial duty" to enact a particular bill or law is questionable. This court has stated that it will not order the Legislature to enact a statute unless that enactment is specifically mandated by the constitution. *City of Ellensburg v. State*, 118 Wn.2d 709, 715, 826 P.2d 1081 (1992). The text of the state constitution contains no such mandate.

Washington cases addressing the creation of new counties have determined that the creation of a new county is "an exercise of legislative power." *Farquharson v. Yeargin*, 24 Wash. 549, 553, 64 P. 717 (1901). This court has explained the constitutional requirements for county formation are a prerequisite to the Legislature's exercise of discretion, stating, "[b]efore this power can be rightfully exercised, it must be made to appear to the legislature affirmatively that the new county" satisfies the requirements. *Id.*

Six years after *Farquharson v. Yeargin*, this court considered the validity of legislation which would have enabled the creation of a Chehalis County, and characterized article XI, section 3, as "a limitation upon the power of the legislature to create a county." *State ex rel. Chehalis County v. Superior Ct.*, 47 Wash. 453, 462, 92 P. 345 (1907). And in *Douglas County v. Grant County*, 72 Wash. 324, 332, 130 P. 366 (1913), this court noted simply that "the division of counties . . . is solely a legislative function[.]" *See also Peacock v. Public Disclosure Comm'n*, 84 Wn. App. 282, 289, 928 P.2d 427 (1996), *review denied*, 131 Wn.2d 1022 (1997).

 The decisions of this court reflect an implicit understanding that the state constitution provides the Legislature with a framework rather than a mandate for county creation. Subject to the limitations of article XI, section 3, the discretion and power to create—or decline to create—a new county resides in the Legislature alone.

SMITH, GUY, JOHNSON, MADSEN, and TALMADGE, JJ., concur.

ALEXANDER, J. (concurring) — I agree with the majority when it concludes that mandamus does not properly lie against the Secretary of State on the basis that he is under no duty under our state's constitution or any statute to perform the duty the petitioners seek to compel him to perform. Because that holding entirely resolves the issue before this court, I take exception to the majority's extensive foray into an issue that is not before us and which, it concedes, it is not "compelled" to resolve. Majority op. at 382.

The additional question the majority addresses is, in essence, whether the Legislature can be compelled to create a county. The petitioners have not sought to compel the Legislature to create a county or do anything else and, in my view, it is improper for us to render an opinion about what discretion or role the Legislature does or does not have in the area of county formation when that issue is not before us. If and when that issue is properly raised, joined, and briefed, we can resolve the question. In the meantime, we should exercise judicial discretion and avoid issuing what can only be described as an advisory opinion.

DURHAM, C.J., and SANDERS, J., concur with ALEXANDER, J.

Reconsideration denied March 11, 1998.